O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

ROBERT CHILDRESS, JR.,          )   NO. EDCV 14-0009-MAN
                                )
         **Plaintiff,**          )
                                )   **MEMORANDUM OPINION**
        **v.**          )
                                )   **AND ORDER**
CAROLYN W. COLVIN,              )
**Acting Commissioner of Social**  )
**Security,**                    )
                                )
        **Defendant.**          )
_____ )

# INTRODUCTION

Plaintiff filed a Complaint on January 2, 2014, seeking review of the denial of his application for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). (ECF No. 1.) On January 31, 2014, the parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before the undersigned United States Magistrate Judge. (ECF No. 9.) On September 11, 2014, the parties filed a Joint Stipulation ("Joint Stip.") in which plaintiff seeks an order reversing the Commissioner's decision and either remanding for further proceedings or awarding benefits to plaintiff. (Joint Stip. at 35.) The Commissioner requests that the ALJ's decision be affirmed or, in the alternative, remanded for further proceedings. (*Id.* at 35-36.) The

1  Court has taken the matter under submission without oral argument.

2

3              **SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

4

5         On June 22, 2010, plaintiff protectively filed his application for a period of disability, DIB,

6  and SSI.  (Administrative Record ("A.R.") 21, 134-48.)  Plaintiff, who was born on April 21, 1949[1]

7  (*id.* 134, 142), claims to have been disabled since August 3, 2009, due to post traumatic stress

8  syndrome ("PTSD"), back pain, and depression (*id.* 21, 178).  Plaintiff has previously worked as

9  a truck driver (DOT 905.664-014), bus driver (DOT 913.463-010), and computer technical support

10  specialist (DOT 033.162-018).  (*Id.* 33-37.)

11

12         After the Commissioner denied plaintiff's claim initially (A.R. 21, 80-84) and on

13  reconsideration (*id.* 21, 90-95), plaintiff requested a hearing (*id.* 21, 96-97).  On December 13,

14  2011, plaintiff, who was represented by a non-attorney representative, appeared and testified at

15  a hearing before Administrative Law Judge Tamara Turner-Jones (the "ALJ").  (*Id.* 21, 39-75.)

16  On February 17, 2012, the ALJ denied plaintiff's claim (*id.* 21-37), and the Appeals Council

17  subsequently denied plaintiff's request for review of the ALJ's decision (*id.* 1-6).  That decision is

18  now at issue in this action.

19

20              **SUMMARY OF ADMINISTRATIVE DECISION**

21

22         The ALJ found that plaintiff had not engaged in substantial gainful activity from his alleged

23  onset date of August 3, 2009.  (A.R. 23.)  The ALJ determined that plaintiff had the severe,

24  medically-determinable impairments of PTSD, major depression, anxiety disorder, and low back

25

26

27  ─────────────────

28       [1]  On the alleged disability onset date, plaintiff was 60 years old, which is defined as a
    person of advanced age.  *See* 20 C.F.R. § 416.963.

                                             2

pain.[2]  (*Id.*)  The ALJ also found that these impairments did not satisfy the requirements of a listed impairment in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  (*Id.* 24.)

After reviewing the record, the ALJ determined that throughout the alleged period of disability, plaintiff retained the residual functional capacity ("RFC") to perform medium work as follows:

> [H]e can lift and/or carry 50 pounds occasionally and 25 pounds frequently; he can stand and/or walk for six hours out of an eight-hour workday with regular breaks; he can sit for six hours out of an eight-hour workday with regular breaks; he is unlimited with respect to pushing and/or pulling, other than as indicated for lifting and/or carrying; he can frequently kneel, stoop, crouch, and crawl; he can frequently climb ramps, stairs, ladders, ropes, and scaffolds; he has no restriction on the use of his hands for gross or fine manipulation; he can sustain attention, concentration, persistence, and pace for at least two hours at a time; he can respond appropriately to co-workers, supervisors, and the general public; he cannot work in a job with a fast paced production requirements or on an assembly line, such as a conveyor belt; he needs to avoid a work environment that would require constant or repeated requests for information from the general public; and he needs to work in an environment with only casual or non-intense interaction with the general public.

(A.R. 26.)

---

[2]    The ALJ also determined that plaintiff's medically determinable impairment of hypertension was non-severe.  (A.R. 24.)

3

The ALJ determined that plaintiff had past relevant work experience as a truck driver[3] and remained capable for performing that work both as actually performed by plaintiff and as generally performed in the regional and national economy, because "[t]his work does not require the performance of work-related activities precluded by [plaintiff]'s [RFC]."  (A.R. 33-34.)

Accordingly, the ALJ concluded that plaintiff has not been under a disability, as defined in the Social Security Act, from August 3, 2009, the alleged onset date, through the date of the ALJ's decision.  (A.R. 34.)

---

[3]  Although not addressed in either the ALJ's opinion or the Joint Stipulation, it is not clear that plaintiff's prior work as a truck driver actually meets the definition of past relevant work.  Past relevant work is work that:  was done within the last 15 years; lasted long enough for the claimant to learn how to do it; and was substantial gainful activity ("SGA").  20 C.F.R. §§ 404.1565(a), 416.965(a).   The Commissioner's primary consideration in determining whether a particular activity constitutes SGA is whether the earnings that the claimant derived from that activity fall above or below the minimum amount established by the Commissioner's Earnings Guidelines.  *Id.* §§ 404.1572(a), 416.972(a); *see also* www.ssa.gov/oact/COLA/sga.html (defining minimum monthly earnings for SGA).  Where the claimant earned less than the minimum monthly amount set by the Commissioner, the ALJ may still determine that plaintiff engaged in SGA, but that decision must be justified with specific findings supported by substantial evidence.  *See* Lewis v. Apfel, 236 F.3d 503, 515 (9th Cir. 2001).

Here, plaintiff's earnings record shows that he received $3,670.26 for his work as a truck driver in 2009.  (A.R. 152, 161.)  The record also shows that plaintiff worked as a truck driver from February 2009, until August 2009. (*Id.* 162 (plaintiff's work history report); *see also id.* 160-61 (confirming that plaintiff did not work for Drivers' Management LLC for more than a year).)  Thus, at most, plaintiff earned $611.71 per month as a truck driver ($3,670.26 ÷ 6 = $611.71).  This falls well below the minimum monthly earnings of $980 that presumptively constituted SGA in 2009, and, consequently, the ALJ was not permitted to treat plaintiff's truck driver work as SGA without first making specific findings about, *inter alia*, the nature, quality, and conditions of plaintiff's work in this capacity.  *See* Lewis, 236 F.3d at 515 (listing the five factors to be considered in determining whether the claimant's work was SGA); *see also* 20 C.F.R. §§ 404.1573, 416.973; www.ssa.gov/oact/COLA/sga.html (setting the minimum amount for SGA in 2009 at $980/month).

Further, the question of whether plaintiff's prior work as a truck driver constitutes past relevant work appears to be critical to the ALJ's nondisability determination.  Plaintiff was 60 years old and, thus, an individual of advanced age on the alleged date of the onset of his disability.  Accordingly, his age significantly affected his ability to adjust to other work.  *See* 20 C.F.R. §§ 404.1563(e), 416.963(e).   Additionally, the VE testified that plaintiff's mental impairments precluded him from performing his past relevant work as a bus driver, as that job is generally performed and actually performed by plaintiff, and also precluded him from performing his past relevant work as a technical support specialist, as that job is generally performed.  (A.R. 68-69.)  The VE also testified that plaintiff would be required to receive retraining to perform his past relevant work as a technical support specialist as actually performed. (*See id.* 70-71.)  Thus, whether plaintiff's prior work as a truck driver constitutes past relevant work is critical to the ALJ's ultimate nondisability determination and should be examined more closely on remand.

1
2

**STANDARD OF REVIEW**

3      Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine
4    whether it is free from legal error and supported by substantial evidence in the record as a whole.
5    Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial evidence is 'more than a mere
6    scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might
7    accept as adequate to support a conclusion.'"  Gutierrez v. Comm'r of Soc. Sec., 740 F.3d 519,
8    522-23 (9th Cir. 2014) (internal citations omitted).  "Even when the evidence is susceptible to
9    more than one rational interpretation, we must uphold the ALJ's findings if they are supported by
10   inferences reasonably drawn from the record."  Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir.
11   2012).

12

13      Although this Court cannot substitute its discretion for that of the Commissioner, the Court
14   nonetheless must review the record as a whole, "weighing both the evidence that supports and
15   the evidence that detracts from the [Commissioner's] conclusion."  Lingenfelter v. Astrue, 504
16   F.3d 1028, 1035 (9th Cir. 2007) (internal quotation marks and citation omitted); Desrosiers v.
17   Sec'y of Health and Hum. Servs., 846 F.2d 573, 576 (9th Cir. 1988).  "The ALJ is responsible for
18   determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."
19   Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

20

21      The Court will uphold the Commissioner's decision when the evidence is susceptible to
22   more than one rational interpretation.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).
23   However, the Court may review only the reasons stated by the ALJ in his decision "and may not
24   affirm the ALJ on a ground upon which he did not rely."  Orn, 495 F.3d at 630; see also Connett
25   v. Barnhart, 340 F.3d 871, 874 (9th Cir. 2003).  The Court will not reverse the Commissioner's
26   decision if it is based on harmless error, which exists only when it is "clear from the record that
27   an ALJ's error was 'inconsequential to the ultimate nondisability determination.'"  Robbins v. Soc.
28   Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Comm'r of Soc. Sec., 454 F.3d

1   1050, 1055 (9th Cir. 2006)); *see also* Carmickle v. Comm'r of Soc. Sec., 533 F.3d 1155, 1162 (9th

2   Cir. 2008).

3

4                                           **DISCUSSION**

5

6          Plaintiff claims that the ALJ erred in failing to:  (1) properly evaluate the medical opinions

7   of Dr. Guo, who examined plaintiff in connection with his back impairment, and Drs. Berg, Larson,

8   and Otero, who examined -- and in some cases treated -- plaintiff in connection with his mental

9   impairments; (2) properly evaluate plaintiff's subjective symptom testimony regarding both his

10  back and mental impairments; and (3) reject the opinion of the examining physician Dr. Sophon

11  regarding plaintiff's back impairment.  (Joint Stip. at 7.)

12

13  **I.      The ALJ Properly Evaluated The Opinion of Dr. Guo.**

14

15          **A.      Background**

16

17         Plaintiff contends the ALJ erred in rejecting the opinion of plaintiff's treating physician, Dr.

18  Andrew H. Guo, an occupational medicine specialist.  On February 16, 2011, Dr. Guo completed

19  a "Functional Evaluation - Consult."  (A.R. 591-94.)   In this evaluation, Dr. Guo opined that

20  plaintiff had degenerative joint disease and anterolisthesis of the lower lumbar spine.  (*Id.* 594.)

21  He also noted that plaintiff has "pain in this area on movement with some radicular [symptoms]

22  to the left [lower extremity]." (*Id.*)  Dr. Guo recommended the following physical restrictions for

23  plaintiff:  no lifting over 25 pounds on a continuous basis and no lifting over 50 pounds on an

24  occasional basis; no repetitive bending; no standing/walking over one hour at a time; no running

25  or jumping; and no ladder climbing.  (*Id.*)  As discussed in greater detail below, the ALJ gave

26  "little weight" to Dr. Guo's opinion that plaintiff would be precluded from performing a full range

27  of medium work.  (A.R. 31.)

28

### B.    Legal Standard

In disability benefits cases, it is the responsibility of the ALJ to resolve conflicts in medical testimony and analyze evidence.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  As a general rule, however, the opinion of a treating physician is entitled to greater weight than that of an examining physician, the opinion of an examining physician is entitled to greater weight than that of a non-examining physician, and the weight afforded a non-examining physician's testimony depends on the degree to which he provided supporting explanations for his opinions.  Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (citing Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008); see also 20 C.F.R. § 404.1527(c).

When a treating or examining physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).  When contradicted by another doctor, a treating or examining physician's opinion is still owed deference and may only be rejected if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record.  Garrison, 759 F.3d at 1012; Orn, 495 F.3d at 632.  An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Garrison, 759 F.3d at 1012 (quoting Reddick, 157 F.3d at 725).  "The ALJ must do more than state conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  Id.

### C.    Analysis

Dr. Guo's assessment of the severity and limiting effects of plaintiff's back impairment conflicts with the assessments of Bunsri T. Sophon, M.D., and the state agency reviewing physicians, M. Bayar, M.D. and Stuart L. Laikan, M.D. PhD, all of whom opined that plaintiff retained the functional capacity to perform heavy work.  (See A.R. 264-69 (opinion of Dr.

7

Sophon), *id.* 273-74 (opinion of Dr. Laikan); *id.* 304 (opinion of Dr. M. Bayar).)  Accordingly, the ALJ was required to articulate specific and legitimate reasons for discounting Dr. Guo's opinion. The ALJ stated that he assigned little weight to Dr. Guo's opinion, because:  (1) his opinion is brief, conclusory, and inadequately supported by clinical findings; (2) his area of specialty does not encompass plaintiff's impairments; (3) his opinion is inconsistent with treatment records that indicate plaintiff responded well to physical therapy; (4) his opinion is inconsistent with the medical evidence; and (5) his opinion is inconsistent with plaintiff's activities of daily living.  (A.R. 31.)

The Court finds that the ALJ's first and second reasons for discounting Dr. Guo's opinion were not specific and legitimate reasons supported by substantial evidence.[4]  However, the other three reasons the ALJ provided -- namely, the inconsistencies between Dr. Guo's opinions and plaintiff's response to physical therapy, plaintiff's medical records, and plaintiff's activities of daily living -- are specific and legitimate reasons for discounting Dr. Guo's opinion and, thus, any error with respect to the ALJ's first two reasons is harmless.

###    1.    Dr. Guo's Opinion Is Inconsistent With Plaintiff's Response To Physical Therapy.

At plaintiff's initial evaluation by his physical therapist, Haije Velasco, DPT, on April 12,

---

[4]  The ALJ's first reason -- that Dr. Guo's opinion is "brief, conclusory, and inadequately supported by clinical findings" (A.R. 31) -- is not supported by the record, which shows that Dr. Guo's opinion was based on a review of plaintiff's medical history and symptoms, a physical examination of plaintiff, a review of a lumbar spine x-ray, and Dr. Guo's diagnosis that plaintiff suffers from degenerative joint disease and anterolisthesis of the lower lumbar spine.  (A.R. 591-94.)  Accordingly, contrary to the ALJ's reasoning, Dr. Guo's opinion is supported, to some extent at least, by clinical and/or diagnostic findings.  The ALJ's second reason -- that the "nature of [plaintiff's] impairments are outside the area of Dr. Guo's speciality" (A.R. 32) -- is not a legitimate reason for discounting Dr. Guo's opinion. *See* 20 C.F.R. § 404.1527(d)(5); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987).  Dr. Guo specializes in occupational medicine, and plaintiff complained that his back impairment (1) was exacerbated by his work as a truck driver and (2) would interfere with his ability to perform other work.  (A.R. 51.)  Thus, it is not clear that the nature of plaintiff's back impairment is, in fact, outside Dr. Guo's area of specialty.

2010, plaintiff stated there were "NO activities" he could perform due to his lower back pain (*id.* 597) but, at the end of his session, stated that he had experienced decreased pain following manual therapy (*id.* 599).  Similarly, at his physical therapy appointment on April 29, 2010, plaintiff reported that his back was "feeling pretty good" and that his lower back pain had decreased further after his physical therapy session. (*Id.* 633-34.) On May 13, 2010, plaintiff told Velasco that his back was sore after he cut grass on a hillside for two hours, but his home exercise program and heating device were generally helping  to relieve his back pain. (*Id.* 631-32.)  On June 10, 2010, after only four physical therapy visits, plaintiff was discharged from physical therapy, because he had achieved his goals and "no longer require[d] skilled need for PT." (*Id.* 427.) Later that month, on June 30, 2010, plaintiff told his treating physician, Dr. Yvette Holness, who is board certified in physical medicine and rehabilitation, that he found physical therapy to be a "big help" and continued to perform his home exercise program and manage his low back pain without pain medication. (*Id.* 420.) The following year, on March 10, 2011, plaintiff reported to Christine Sun, M.D., an internist, that he continued to experience some back pain, but it was "not too bad" and he could walk between a mile and a mile and a half daily without difficulty. (*Id.* 612.)

        In sum, plaintiff's treatment records show that plaintiff's back impairment was effectively managed with physical therapy, and in assessing Dr. Guo's opinion the ALJ was entitled to consider the fact that plaintiff's back impairment improved with no more than routine and conservative treatment. *See* Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir.1995).  Further, "conservative treatment" has been characterized by the Ninth Circuit to include, *inter alia*, physical therapy and the use of anti-inflammatory medication. *See e.g.*, Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir.2008).  Accordingly, the fact that plaintiff's back impairment was effectively treated with less than a year of physical therapy and without prescription pain medication was a specific and legitimate reason, supported by the record, for discounting Dr. Guo's opinion.

**2.      Dr. Guo's Opinion Is Inconsistent With Plaintiff's Daily Activities.**

The ALJ also did not err in assigning Dr. Guo's opinion little weight on the grounds that it is "inconsistent with [plaintiff's] admitted activities of daily living." (A.R. 27.)  As noted by the ALJ, plaintiff reported that he, *inter alia*, works on model airplanes, prepares meals, watches television, drives, completes light household chores, takes walks and visits with his daughter and grandchildren.  (*Id*. 27, 368.)  Further, on September 20, 2011, just a month after Dr. Guo's evaluation, plaintiff reported, during a mental health visit with Lillian Navas, MSW, that he had been "building his furniture, trimming the trees and plants outside his house[, and] . . . helping his sister keep[] up her yard and build a retaining wall" and had recently returned from a fishing trip.  (*Id*. 728-29.)  The ALJ was entitled to reject Dr. Guo's opinion to the extent it imposed highly restrictive functional limitations inconsistent with plaintiff's significant daily activities.  *See* Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 601–02 (9th Cir. 1999) (upholding rejection of physician's conclusion that claimant suffered from marked limitations based on, in part, claimant's reported activities of daily living contradicted that conclusion); *see also* Batson v. Comm'r of Soc. Sec., 359 F.3d 1190, 1193 (9th Cir. 2004) (when evidence supports more than one rational interpretation, courts defer to the Commissioner's decision).

**3.      Dr. Guo's Opinion Is Inconsistent With The Objective Medical Evidence.**

Finally, the ALJ did not err in assigning Dr. Guo's opinion little weight on the grounds that it is "inconsistent with the objective medical evidence as a whole[,] . . . which shows generally unremarkable findings." (A.R. 32.)  As stated above, plaintiff's back pain was treated with four physical therapy appointments in 2010, and the implementation of a home exercise program.  On June 30, 2010, Dr. Holness stated that following plaintiff's discharge from physical therapy, he was effectively treating his low back pain with home exercises and without pain medication.  (*Id*. 420.)  On August 27, 2010, plaintiff did not report any problems with back pain during his

10

appointment with Dr. Sun, and she observed that he was ambulating well.  (*Id.* 397-98.)

On August 31, 2010, consultative orthopedic surgeon, Dr. Bunsri T. Sophon examined plaintiff's back and reported, *inter alia*, that plaintiff:  used no assistive device to ambulate; is able to get on and off the examining table without difficulty; exhibited a full range of motion of the cervical spine; and performed a straight leg test that was negative in both the sitting and supine bilaterally positions.  (A.R. 266.)  Plaintiff's range of motion of the upper and lower extremities revealed no deformities and were within normal limits.  (*Id.* 266-67.)

On September 13, 2010, state agency medical consultant Dr. Stuart L. Laiken determined there was "no objective evidence of a severe persisting functioning impairment that would more than minimally affect [plaintiff's] work performance for a 12 consecutive month periods," as such "[t]his case must be classified as non-severe from the physical standpoint."  (*Id.* 273.)  On December 23, 2010, state agency medical consultant Dr. M. Bayar agreed with Dr. Laiken's findings.[5]  (*Id.* 304); *see* Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001) (holding that opinions of nontreating or nonexamining doctors may serve as substantial evidence when consistent with independent clinical findings or other evidence in the record); *see also* Andrews, 53 F.3d at 1041 (noting that "reports of the nonexamining advisor need not be discounted and may serve as substantial evidence when they are supported by other evidence in the record and are consistent with it").

Thus, plaintiff's medical records, the report of Dr. Sophon's examination, and the reports of the reviewing state agency physicians were all inconsistent with Dr. Guo's assessment of the severity and limiting effects of plaintiff's back impairment.  Accordingly, the ALJ did not err in citing the inconsistency between Dr. Guo's opinion and the objective medical evidence as one of

---

[5]  The ALJ did not give "great weight" to the determinations of the state agency medical consultants, because they also did not adequately consider plaintiff's subjective complaints.  (A.R. 32.)

1  several reasons for her decision to discount Dr. Guo's opinion and to accord great weight to the

2  contrary opinion of Dr. Sophon.

3

4  **II.    The ALJ Did Not Properly Evaluate The Opinion Of Dr. Berg.**

5

6       Plaintiff challenges the ALJ's evaluation of the opinion of Dr. Gene N. Berg, the clinical

7  psychologist who examined plaintiff on December 7, 2011, at the request of plaintiff's attorney,

8  and prepared a detailed report of his findings.   (*See* Joint Stip. At 12-13; *see also* A.R. 740-52.)

9  In connection with his report, Dr. Berg reviewed "multiple records . . . from the Veteran's

10  Administration."   (*Id.* 742.)   Dr. Berg diagnosed plaintiff with:   major depressive disorder,

11  recurrent; posttraumatic stress disorder, and bereavement, complicated. (*Id.* 742, 745.) He also

12  assessed plaintiff with a GAF score of 55, indicating moderate symptoms or moderate difficulty

13  in social, occupational, or school functioning.[6]   (*Id.* 743, 745.)   Dr. Berg opined:.

14

15       [Plaintiff] continues to suffer from symptoms which are not only consistent with

16       PTSD, but also consistent with a Major Depressive Disorder, and a Complicated

17       Bereavement. [Plaintiff] continues to require more time in treatment and

18       medication.  In the professional opinion of this examiner, findings detected in this

19       evaluation indicated that [plaintiff] does not have the emotional and mental

20       resources at this time to work a full time job in the next year.  [Plaintiff's] prognosis

21       is guarded.

22

23  (A.R. 743.)  On a separate "Psychiatric/Psychological Impairment Questionnaire," Dr. Berg listed

24  his clinical findings, diagnostic test results, and assessment of plaintiff's functional limitations, and

25  he opined that plaintiff:  is moderately limited in all areas of understanding and memory,

26  _____

27      [6]  Specifically, a GAF rating of 51–60 reflects "[m]oderate symptoms (*e.g.*, flat affect and
circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or

28  school functioning (*e.g.*, few friends, conflicts with peers or co-workers)."  DIAGNOSTIC AND
STATISTICAL MANUAL OF MENTAL DISORDERS, at 32 (4th Ed. 2000).

1  sustained concentration and persistence, and adaptation (*id.* 748-50); is incapable of performing

2  even low stress jobs (*id.* 751); and would miss work more than three times a month (*id.* 751-52).

3

4      The ALJ stated that he considered Dr. Berg's opinion but gave it "little weight," to the

5  extent it would preclude plaintiff from working at the level of substantial gainful activity, because

6  Dr. Berg's opinion is:  (1) brief, conclusory, and inadequately supported by clinical findings; (2)

7  inconsistent with the objective medical evidence, which shows that plaintiff can function

8  adequately when he is taking his medications; and (3) inconsistent with plaintiff's daily activities.

9  (A.R. 33.)   As explained below, these are not specific and legitimate reasons supported by

10  substantial evidence for discounting Dr. Berg's opinion.

11

12      **A.    Dr. Berg's Opinion Is Not Brief, Conclusory, and Inadequately Supported.**

13

14      The ALJ's first rationale for rejecting Dr. Berg's opinion -- *i.e.*, that it is "brief, conclusory,

15  and inadequately supported by clinical findings" -- is not supported by the record.  (A.R. 31.)  The

16  ALJ stated that "Dr. Berg primarily summarized in the treatment notes [plaintiff's] subjective

17  complaints, diagnoses, and treatment, but he did not provide medically acceptable clinical or

18  diagnostic findings to support [his] functional assessment" of plaintiff.  (*Id.*)  However, the ALJ

19  overlooks the fact that Dr. Berg bases the findings and conclusions reflected in the December

20  2011 questionnaire not only on plaintiff's subjective complaints, diagnoses, and treatments but

21  also on the administration of a "psychological history questionnaire and mental status examination

22  [conducted] over an hour period of time," as well as on "documentation relating to [plaintiff's]

23  medical/psychiatric condition." (*Id.* 740, 746.)  The questionnaire also reflects Dr. Berg's clinical-

24  behavioral observations of plaintiff.  (*Id.* at 740-41.)  Thus, contrary to the ALJ's reasoning, Dr.

25  Berg's opinion was supported by clinical and/or objective medical evidence.

26  \\

27  \\

28  \\

**B.    Dr. Berg's Opinion Is Not Inconsistent With Plaintiff's Medical Records That Show Improvement With Medication.**

The ALJ's second rationale for rejecting Dr. Berg's opinion was that it is "inconsistent with the objective medical evidence as a whole . . . which shows that [plaintiff] is able to function when he is taking his medication properly."  (A.R. 33.)   Although impairments that are effectively controlled with medication are not disabling under the Social Security Act, *see* Warre v. Comm'r of Soc. Sec., 439 F.3d 1001, 1006 (9th Cir. 2006), the ALJ's finding that plaintiff's PTSD, major depression, and anxiety disorder are effectively controlled with medication -- and have been effectively controlled with medication from the date on which they allegedly became disabling -- is not supported by substantial evidence.[7]   To the contrary, plaintiff's treatment notes show that he was unable to control his symptoms with medication during the first year following the alleged onset date of his disability, and it took more than a year of intensive psychiatric treatment -- including frequent talk therapy in both one-on-one and group settings and repeated trials of, and adjustments to, a cocktail of prescription drugs -- before plaintiff's mental impairments began to stabilize.  (*See generally* A.R. 362-527.)  Specifically, plaintiff's statements to his care providers during the first year after his disability allegedly began show that plaintiff:  only ate one meal a day or every other day for at least two months (*id.* 496 (11/12/09 therapy session), 515 (10/9/09 therapy session)); experienced weekly panic attacks (*id.* 481-82 (2/4/10 therapy session)); sometimes was unable to sleep for 24-48 hour periods (*id.*; *see also id.* 391 (plaintiff reports nightmares at 9/14/10 therapy session)); spent many days in bed due to depression (*id.* 435 (5/19/10 therapy session)); had suicidal ideation and thought about killing himself with carbon monoxide (*id.* 481-82 (2/4/10 therapy session)); appeared thin, haggard, and unkempt (*id.* 481-82 (2/4/10 therapy session), 489 (12/2/09 therapy session)); was unable to "turn his mind off"

---

[7]   In Warre, the Ninth Circuit found that a child with a rare metabolic disorder, who had received SSI benefits as an infant, was no longer eligible for benefits because, *inter alia*, his impairments had become effectively controlled with medication.  439 F.3d at 1002-03, 1006. However, there was a period during which the plaintiff in Warre received benefits, because his metabolic disorder was *not* effectively controlled by medication during that period.

1  (*id.* 391 (9/14/10 therapy session)); and avoided interacting with people (*id.*).

2

3      The record also shows that plaintiff's medication plan was repeatedly changed in the more

4  than 14 month period between the alleged onset date, August 3, 2009, and November 19, 2010.

5  In August 2009, plaintiff was prescribed citalopram (Celexa), an antidepressant, and hydroxyzine

6  (Vistaril). (A.R. 528.)  Plaintiff subsequently received prescriptions for another antidepressant --

7  trazodone -- and lorazepam (Ativan). (*See id.* 489-90.)  In February 2010, plaintiff's prescription

8  for hydroxyzine was discontinued because it made him too sedated, but his lorazepam and

9  trazodone dosage were increased. (*Id.* 483.)  The following month, plaintiff's trazodone dosage

10  was increased for a second time. (*Id.* 468.)  Around the same time, plaintiff's prescription for

11  lorazepam was discontinued, and he started taking aripiprazole (Abilify), an antipsychotic. (See

12  i*d.* 436.)  In May 2010, plaintiff's trazodone dosage was increased for a third time. (*Id.* 437.)  In

13  August 2010, plaintiff's aripiprazole dosage was increased, and he was put back on lorazepam.

14  (*Id.* 401.)  During the following month plaintiff's aripiprazole dosage was increased for a second

15  time, and his trazodone prescription was discontinued and replaced with a prescription for

16  temazepam because, despite the increases in dosage amounts, the trazodone was "not holding

17  him for sleep." (*Id.* 391.)  By November 2010, plaintiff's medication regime appeared to stabilize

18  with plaintiff taking 20mg of aripiprazole daily, 60 mg of citalopram daily, 30 mg of temazepam

19  daily, and 10-20 mg of lorazepam as needed for anxiety. (*Id.* 371 (prescription plan as of

20  November 19, 2010); *see also id.* 363 (all medications and dosages continued on December 30,

21  2010).)  In December 2010, plaintiff reported feeling like the medications were helping, and

22  plaintiff's Nurse Practitioner, Mary Beare, wrote that plaintiff "is still struggling with the depression

23  and PTSD but is no longer wanting to kill himself." (*Id.* 363.)  In sum, the record shows that

24  plaintiff's PTSD, major depression, and anxiety disorder were *not* effectively controlled with

25  medication for at least a year, if not longer.  Accordingly, the ALJ erred in assigning little weight

26  to Dr. Berg's opinion on the grounds that plaintiff's mental impairments were effectively controlled

27  with medication.

28  \\

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**C.    Dr. Berg's Opinion Is Not Inconsistent With Plaintiff's Activities Of Daily Living.**

Lastly, the ALJ rejected Dr. Berg's opinion because the medical evidence demonstrates that plaintiff can function as "evidenced by his admitted activities of daily living." (A.R. 33.)  However, the ALJ did not identify any particular activities of daily living that were inconsistent with Dr. Berg's assessment of the severity and limiting effects of plaintiff's mental impairments.  (*See generally id.*)  Further, as discussed above, plaintiff's statements to his care providers during the first year after his disability allegedly began reveal that plaintiff's mental impairments:  prevented him from adequately feeding himself; caused him to suffer weekly panic attacks, nightmares, and periods of sleeplessness lasting 24-48 hours; confined him to bed for multiple days at a time; led him to consider killing himself with carbon monoxide; interfered with his personal grooming; and caused him to avoid interactions with people.  Thus, it appears that, for at least a year, plaintiff was unable to perform even the most basic activities of daily living.

In addition, although plaintiff's treatment notes suggest that his mental condition improved over time with treatment, the ALJ identified no specific reason for finding that plaintiff's daily activities in late 2011 were inconsistent with Dr. Berg's assessment of his limitations.    In September 2011, a few months before Dr. Berg examined him, plaintiff told his care providers he had started doing yard work at his sister's house and at his own, made friends with a neighbor with whom he played dominoes, and went on a fishing trip.  (A.R. 728-29 (9/20/11 therapy session).)  Plaintiff's ability to make one friend, perform some yard work at his own house and at a relative's, and go on a fishing trip are indicators of significant progress relative to plaintiff's poor mental condition on his alleged disability onset date.  However, they are not inconsistent with Dr. Berg's opinion that plaintiff is unable to hold down a full time job and would be absent at least three times a month.  *Cf.* Garrison, 759 F.3d at 1017 (reports of improvement in the context of mental health issues must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant

1   can function effectively in a workplace"); *see also* <u>Hutsell v. Massanari</u>, 259 F.3d 707, 712 (9th

2   Cir. 2001) ("[T]he Commissioner erroneously relied too heavily on indications in the medical

3   record that [the plaintiff] was 'doing well,' because doing well for the purposes of a treatment

4   program has no necessary relation to a claimant's ability to work or to her work-related functional

5   capacity."). Accordingly, the ALJ's finding that plaintiff's daily activities conflicted with Dr. Berg's

6   opinion was neither adequately explained nor supported by substantial evidence in the record and,

7   therefore, was not a specific and legitimate reason for discounting Dr. Berg's opinion.

8

9      **D.    Dr. Larson's Opinion Did Not Provide Substantial Evidence For The ALJ's**

10          **Decision To Discount Dr. Berg's Opinion.**

11

12          Having rejected Dr. Berg's opinion, the ALJ elected to accord "great weight" to the opinion

13   of Dr. Douglas W. Larson, the licensed psychologist who examined plaintiff at the Commissioner's

14   request on August 27, 2010. (A.R. 32.) However, Dr. Larson's opinion does not provide

15   substantial evidence for the ALJ's decision to discount Dr. Berg's opinion. First, unlike Dr. Berg,

16   Dr. Larson was unable to review any of plaintiff's medical records. (*Id.* 257.) Thus, his opinion,

17   unlike that of Dr. Berg, was based solely on a single snapshot of plaintiff's condition. *Cf.* <u>Van Dyke</u>

18   <u>v. Colvin</u>, No. EDCV 14-1182-PLA, 2015 WL 1457953, at *8 (C.D. Cal. Mar. 30, 2015) (writing that

19   where the consulting examiner's opinion was formulated without a review of the plaintiff's mental

20   health records, his opinion is little more than a 'snapshot' assessment of plaintiff's condition at the

21   point in time of the evaluation).

22

23          Second, and more significantly, many of Dr. Larson's findings support, rather than conflict

24   with, Dr. Berg's opinion. Dr. Larson wrote that plaintiff reported struggling with, *inter alia*:

25   "significant depression"; nightmares and difficulty sleeping; intermittent suicidal ideation, as well

26   as "transient homicidal ideations"; recurring "anxiety issues"; social isolation; and decreased

27   appetite. (A.R. 257-58.) Plaintiff also reported that, "on a daily basis, [he] generally watches TV

28   and stays in bed because of his depression." (*Id.* 259.) Dr. Larson found that plaintiff "appeared

genuine and truthful" and "[t]here was no evidence of exaggeration or manipulation." (*Id.* 260.) Dr. Larson further observed that plaintiff's mood was "depressed and anxious," and his affect was "consistent with [his] mood." (*Id.* 260.) Dr. Larson diagnosed plaintiff with PTSD and depressive disorder, not otherwise specialized, and, like Dr. Berg, he assessed plaintiff with a GAF score of 55, indicating moderate symptoms and/or moderate difficulty in social, occupational, or school functioning. (*Id.* 261.) Dr. Larson stated that plaintiff has "residual PTSD symptoms" and described plaintiff's depression as "ongoing and somewhat nonresponsive to treatment." (*Id.* 261-62.) Like Dr. Berg, Dr. Larson stated that his prognosis for plaintiff was "guarded" and plaintiff "probably needs" more aggressive treatment. (*Id.* 261-62.)

Despite his assessment of a GAF score of 55 and his determination that plaintiff's depression was not fully responsive to treatment and could benefit from more aggressive therapy, Dr. Larson found that plaintiff had no more than mild limitations in his ability to: "associate" with day-to-day work activity; maintain regular attendance; perform work activities without special or additional supervision; accept instructions from supervisors; maintain concentration, attention, persistence, and pace; relate and interact with co-workers and the public; and understand, remember, and carry out simple one or two step, or more complex, job instructions. (*Id.* 262.) Accordingly, Dr. Larson's opinion is at odds with his own findings and the medical record as a whole, as well as Dr. Berg's opinion, and Dr. Larson's opinion does not provide substantial evidence for the ALJ's decision to discount Dr. Berg's opinion.

**III.   The ALJ Erred In Discounting The Opinion Of Dr. Otero And Nurse Practitioner Beare.**

Plaintiff next challenges the ALJ's decision to accord little weight to a December 7, 2011 opinion written and signed by Mary Beare, the nurse practitioner with the Veterans' Administration (VA) who treated plaintiff for his mental impairments before and throughout the alleged period of disability, and adopted by Dr. Jay M. Otero, a VA psychiatrist. (Joint Stip. at 12-13.) The

1   opinion reads as follows:

3       I have known this patient since December 21, 2007.

5       Patient has severe PTSD related to his service time in Vietnam.

7       Patient for as long as I have known him has struggled with depression and severe
8   panic attacks -- over the time that I have known him he [has] tried to go back to
9   work as a truck driver -- this was a really difficult struggle for him because of the
10   panic attacks -- patient had a minor accident with the truck as a result of a severe
11   severe [sic] panic attack -- patient was hospitalized after this panic attack -- he was
12   let go [from] his job after this incident.

14       Patient has been on psychiatric medications that somewhat reduce or manage his
15   symptoms -- he still struggles with anxiety -- he has isolated himself in an effort to
16   reduce exposure to people and stress -- he would never be able to go back to work
17   and maintain work due to the stress of being around people, panic attacks, severe
18   anxiety, and depression -- patient has difficulties with concentration and focus -- it
19   takes him a long time to do even a simple task or project that he is working on at
20   home -- every time I've seen patient he is very quiet in the visits . . . he is usually
21   quite guarded about how he feels -- he will usually say that he is doing okay --
22   consistently presents as depressed and anxious.

24       Patient is consistently taking his psychiatric medications -- over the years various
25   medications have been tried and the present combination of medication seems to
26   be the best for him according to what he tells me.

28       Since patient has been isolating himself living alon[e] not really socializing or getting

1   out with other people -- his symptoms have somewhat stabilized -- he continues to

2   very obsessive about Vietnam -- he is on the Internet all the time looking up various

3   things about when he was in the service -- he gets very fixated with Vietnam in

4   relation to this helicopter accident that he experienced in Vietnam.

6   Please see extensive psychiatric notes related to this patient.

8   (A.R. 683.)

10   The ALJ determined that Beare and Otero's assessment of the severity and limiting effects

11   of plaintiff's mental impairments was "less persuasive" than the conflicting opinion of the

12   examining psychiatrist, Dr. Larson, because the Beare/Otero opinion was:  (1) inconsistent with

13   plaintiff's records of medical improvement; (2) inconsistent with the evidence that plaintiff's

14   mental impairments were effectively controlled with medication; and (3) "conclusory . . . with little

15   explanation of the evidence relied [up]on."  (A.R. 31, 32.)

17   The ALJ's assertion that the December 7, 2011 Beare/Otero opinion is "conclusory" is not

18   a legitimate reason supported by substantial evidence for rejecting the opinion.  Nurse Practitioner

19   Beare wrote that the opinion is based on "extensive psychiatric notes," and the record contains

20   a multitude of treatment notes signed by Nurse Practitioner Beare.  (*See e.g.,* A.R. 362-62

21   (12/20/10), 369-72 (11/29/10), 378-81 (10/20/10), 391-93(9/14/10), 400-02 (8/11/10), 435-38

22   (5/19/10), 467-68 (3/26/10), 481-84 (2/4/2010 - co-signed by psychologist Nancy L. Farrell,

23   PsyD), 488-91 (12/2/09), 525 (9/02/09), 527-30 (8/14/09 - co-signed by Dr. Otero).)  Accordingly,

24   the ALJ's determination that the December 7, 2011 opinion is "conclusory" is not a legitimate

25   reason supported by substantial evidence for discounting that opinion.

27   The ALJ also erred in discounting the December 7, 2011 Beare /Otero opinion on the

28   grounds that it was inconsistent with evidence of medical improvement and plaintiff's ability to

20

effectively control his mental impairments with medication.   As discussed above in connection with the ALJ's rejection of Dr. Berg's opinion, plaintiff's mental impairments were not effectively controlled by medication during the first year of his disability, and Drs. Berg and Larson, as well as Nurse Practitioner Beare and Dr. Otero, uniformly found that, although plaintiff's condition improved with medication and talk therapy, he continued to struggle with his mental impairments.

Furthermore, plaintiff's medical improvement -- as demonstrated by his ability to make one friend, perform some yard work at his own house and at a relative's, and go on a fishing trip -- is not a legitimate reason for finding that plaintiff has the capacity to perform a full time job.  As the Ninth Circuit has repeatedly emphasized, reports of improvement in the context of mental health issues must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." Garrison, 759 F.3d at 1017; see also Hutsell, 259 F.3d at 712 (fact that the claimant was "doing well" under treatment is not indicative of the claimant's ability to work); Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."). Accordingly, the ALJ erred in citing plaintiff's improvement in response to treatment and limited exposure to environmental stressors as grounds for discounting the opinion of Nurse Practitioner Beare and Dr. Otero that plaintiff is unable to work a full time job "due to the stress of being around people, panic attacks, severe anxiety, and depression."

## IV.   The ALJ Properly Evaluated Plaintiff's Credibility With Respect To His Alleged Physical Impairments.

Once a disability claimant produces objective medical evidence of an underlying impairment that is reasonably likely to be the source of claimant's subjective symptom(s), all subjective testimony as to the severity of the claimant's symptoms must be considered. Moisa v. Barnhart,

367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991); *see also* 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins, 466 F.3d at 883.  The factors to be considered in weighing a claimant's credibility include:  (1) the claimant's reputation for truthfulness; (2) inconsistencies either in the claimant's testimony or between the claimant's testimony and her conduct; (3) the claimant's daily activities; (4) the claimant's work record; and (5) testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *See* Thomas v. Barnhart, 278 F.3d 947, 958–59 (9th Cir. 2002); *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).

Here, "after careful consideration of the evidence," the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms." (A.R. 28.)  Significantly, the ALJ cited no evidence of malingering by plaintiff.  Nonetheless, the ALJ determined that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (*Id.*)  Thus, the ALJ was required to articulate clear and convincing reasons for her adverse credibility determination.

Plaintiff testified that his back pain made it difficult to perform his past work as a truck and bus driver, which required sitting for long periods of time, and as a computer technician, which required going up and down on his knees and moving computer boxes. (A.R. 51-52.)  He testified that he experienced "constant pain" in his back (*id.* 52), for which he took 800 mg of Ibuprofen (*id.* 53).  Plaintiff testified that he did lift weights "a bit," including bicep curls with nine pound weights and chest presses with a 15 pound weight in each hand. (*See id.* 60, 63.)  He testified that lifting 30 pounds while standing would be hard on his back.  (*Id.* 63.)

1    The ALJ discounted plaintiff's subjective symptom testimony because:  (1) he was able to

2    manage his symptoms with conservative care, *i.e.*, heat, medication, and physical therapy; (2) his

3    daily activities were inconsistent with his alleged functional limitations; and (3) his allegations of

4    back pain and related functional limitations are inconsistent with the absence of muscle atrophy.

5    (A.R. 27-28.)  Although the ALJ may have erred in citing plaintiff's limited daily activities and lack

6    of muscle atrophy as grounds for her adverse credibility determination,[8] any error is harmless,

7    because plaintiff's favorable response to conservative treatment was a clear and convincing reason

8    supported by the record for discounting plaintiff's testimony.

9

10    Specifically, the ALJ found that the "lack of more aggressive treatment, surgical

11    intervention, or even a referral to a specialist" suggests that plaintiff's back pain symptoms and

12    related functional limitations were not as severe as plaintiff alleged.  (A.R. 27-28.)  Plaintiff's back

13    pain was conservatively and intermittently treated with Ibuprofen, a heating pad, and physical

14    therapy.  (*See id.* 181, 222, 347-48, 368, 420, 440, 553, 591, 686.)  Plaintiff also admitted at the

15    hearing that he only takes Ibuprofen for his back pain.  (*Id.* 52-53.)  Although plaintiff stated that

16    he does not take anything stronger because he "sh[ies] away from any hard drug," there is no

17

18    _____

19    [8]  With regard to plaintiff's daily activities, the ALJ stated that plaintiff was less than credible
because he reported being able to perform the following daily activities independently:  working

20    on model airplanes; preparing meals (namely, cold cereal, sandwiches, and instant noodles);
watching television; driving; completing light household chores; taking walks; and visiting with

21    his daughter and grandchildren.  (A.R. 27.)  A plaintiff's daily activities may be "grounds for an
adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in

22    pursuits involving the performance of physical functions that are transferable to a work setting.'"
Orn, 495 F.3d at 639 (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989)).  Here, however,

23    there is no indication that plaintiff's limited activities either comprised a "substantial" portion of
plaintiff's day, or were "transferrable" to a work environment.  *See id.*; *see also* Smolen, 80 F.3d

24    at 1284 n. 7 (recognizing that "many home activities may not be easily transferrable to a work
environment").

25    With regard to the lack of evidence of muscle atrophy in plaintiff's back, the ALJ stated that
muscle atrophy "is a common side effect of prolonged and/or chronic pain" and, thus, it can be

26    inferred from plaintiff's lack of muscle atrophy that the back pain has not "altered his use of those
muscles."  (A.R. 28.)  The ALJ cited no medical opinion or medical literature that supports the

27    conclusion that someone with plaintiff's impairments necessarily would or should have muscle
atrophy.  Accordingly, the ALJ erred by discounting plaintiff's testimony partly on the basis of her

28    own medical judgment.  *See* Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is
forbidden from making his own medical assessment beyond that demonstrated by the record).

1  evidence in the record that he was ever prescribed stronger medication and/or declined to take

2  stronger medication.  (*Id.* 53, 591.)  Further, as discussed above, there is evidence in the record

3  that plaintiff's back pain responded quickly and favorably to physical therapy and heat.

4

5       The ALJ was entitled to discount plaintiff's subjective symptom testimony on the ground

6  that plaintiff effectively managed his allegedly disabling back pain with conservative treatment.

7  *See* Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (noting that "evidence of 'conservative

8  treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment");

9  Tommasetti, 533 F.3d at 1040 (characterizing physical therapy as conservative); Walter v. Astrue,

10  No. EDCV 09-1569-AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly

11  discounted plaintiff's credibility based on "conservative treatment," including medication, physical

12  therapy, and injection).  Further, because plaintiff's favorable response to conservative treatment

13  was a clear and convincing reason for the ALJ's adverse credibility determination, any error with

14  respect to the ALJ's other two reasons for discounting plaintiff's testimony is harmless.  *See*

15  Carmickle, 533 F.3d at 1162-63.

16

17  **V.    The ALJ Improperly Evaluated Plaintiff's Credibility With Respect To His Mental**

18  **Impairments**.

19

20       With respect to his mental impairments, plaintiff testified that his mental impairments

21  rendered him unable "to concentrate and stay focused on things." (A.R. 52-53.)  He testified that

22  he had tried a variety of medications over the years but had to discontinue some of those

23  medications, because he had an adverse reaction to them.  (*See id.* 54-55.)  Plaintiff also testified

24  that, although he was able to attend group therapy, outside of the therapeutic context he only had

25  social relationships with three or four people.  (*Id.* 56.)  He testified that he usually puts the TV

26  on "for noise, so it's not quiet" but, instead of sitting and watching TV programs, usually paces

27  or lies down.  (*Id.* 58-59.)  "I pace a lot," he added.  (*Id.*)  He also testified that he used the

28  computer at home, but only in 20-30 minute increments.  (*Id.* 59; *see also id.* 59-60.)

24

1    On August 7, 2010, a year after the date his disability allegedly began but a year before
2    the hearing, plaintiff completed an Adult Function Report detailing his limitations and daily
3    activities. (A.R. 192-99.)  In that report, plaintiff stated that he spent most his time in his room
4    "contemplating [his] situation." (*Id.* 192.)  He wrote that he bathed and dressed himself "only if
5    I have to" or "if I can't take it anymore." (*Id.* 193.)  Similarly, he shaved only when having not
6    done so began to irritate him. (*Id.*)  He ate once a day (*id.* 193, 194), and when he prepared his
7    own meals, he prepared cold cereal, sandwiches, or instant noodles (*id.* 194).  Plaintiff no longer
8    cooked full meals (*id.*) and had also lost interest in his model airplane hobby (*id.* 195).  With
9    reminders and encouragement, he did his laundry once every other week, mowed the lawn once
10   a month, and went grocery shopping once a month. (*Id.* 194, 195.)  The only place plaintiff went
11   on a regular basis was to group therapy. (*Id.*)  He described his social life as "non-existent." (*Id.*
12   197.)  He testified that he had to read written instructions "several" times before he could follow
13   them, and he could follow spoken instructions only if he took "good notes." (*Id.*)  He stated that
14   he did not handle stress well and would become withdrawn. (*Id.* 198.)  Similarly, changes in his
15   routine threw him off and interfered with his concentration. (*Id.*)  When asked if he had noticed
16   any unusual behavior or fears, plaintiff stated that he "become[s] tense and hypervigilant" when
17   he senses that things are "off kilter." (*Id.*)

18

19   The ALJ discounted plaintiff's subjective symptom testimony regarding his mental
20   impairments, because she found that plaintiff:  (1) was able to manage his symptoms with
21   conservative care, *i.e.*, medication and talk therapy; and (2) performed daily activities that were
22   inconsistent with his alleged functional limitations. (A.R. 27-28.)  As explained below, these are
23   not clear and convincing reasons supported by substantial evidence for discounting plaintiff's
24   testimony about the severity and limiting effects of his mental impairments.

25   \\

26   \\

27   \\

28   \\

**A.  Plaintiff Was Not Able To Manage The Mental Health Symptoms Caused By His Mental Impairments.**

As discussed above in connection with the ALJ's rejection of Dr. Berg's opinion, the record shows that plaintiff's mental impairments were not effectively controlled by medication for more than a year following the alleged onset of his disability, and Drs. Berg, Larson, and Otero agreed that, although plaintiff's mental condition improved over time with medication and therapy, he continued to struggle with his mental impairments.  For example, on August 27, 2010, a full year after plaintiff's disability began, the examining psychiatrist, Dr. Larson, opined that plaintiff has "residual PTSD symptoms," plaintiff's depression is "ongoing and somewhat nonresponsive to treatment," and plaintiff "probably needs" more aggressive treatment.  (A.R. 261-62.)  Similarly, in December 7, 2011, over two years after plaintiff's disability began, the medical sources most familiar with plaintiff's treatment -- Dr. Berg, Dr. Otero, and Nurse Practitioner Beare -- signed opinions stating that plaintiff's mental impairments precluded him from performing full-time work. (*See id.* 743 (Dr. Berg opines that plaintiff "does not have the emotional and mental resources at this time to work a full time job in the next year" and his "prognosis is guarded"); 683 (Nurse Practitioner Beare and Dr. Otero opine that plaintiff's medications only "somewhat reduce or manage his symptoms" and "he would never be able to go back to work and maintain work due to the stress of being around people, panic attacks, severe anxiety, and depression").) Accordingly, the ALJ erred in discounting plaintiff's testimony on the grounds that his mental health symptoms were effectively controlled with talk therapy and medication.

Further, the Central District and other courts have found that treatment similar to what plaintiff has required, *i.e.*, multiple years of talk therapy, prescription antidepressants (in this case, citalopram and trazodone), and prescription antipsychotics (in this case, aripiprazole), is not properly characterized as conservative treatment.  *See e.g.*, Mason v. Colvin, No. 1-12-cv-00584 GSA, 2013 WL 5278932, at *6 (E.D. Cal. Sep. 18, 2013) (plaintiff's treatment was not conservative where plaintiff took prescription antidepressants and antipsychotic medication for almost two years

1 and received counseling from a psychiatrist and psychiatric social worker); *see also* Johnson v.

2 Colvin, No. EDCV 13-1476-JSL (E), 2014 WL 2586886, at *5 (C.D. Cal. June 7, 2014) (surveying

3 the case law); Baker v. Astrue, 09-01078 RZ, 2010 WL 682263, at *1 (C.D. Cal. Feb.24, 2010)

4 ("Where mental activity is involved, administering medications that can alter behavior shows

5 anything but conservative treatment.").   Thus, even if plaintiff's mental impairments were

6 effectively controlled with his medication regimen and talk therapy, the Court would be disinclined

7 to find that this fact was a clear and convincing reason for discounting his subjective symptom

8 testimony regarding the symptoms caused by his mental impairments.

9

10 **B.     Plaintiff's Testimony Is Not Inconsistent With His Daily Activities**.

11

12 The ALJ also erred in finding that plaintiff had a "somewhat normal level" of daily activities

13 and social interactions that were inconsistent with the alleged severity of his mental impairments.

14 (*See* A.R. 27.)  A plaintiff's daily activities may be "grounds for an adverse credibility finding 'if a

15 claimant is able to spend a substantial part of his day engaged in pursuits involving the

16 performance of physical functions that are transferable to a work setting.'"  Orn, 495 F.3d at 639

17 (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir.1989)).  Here, however, as discussed above,

18 plaintiff's statements to his care providers for more than a year after his disability began reveal

19 that plaintiff was unable to spend any portion of his day engaged in pursuits that were

20 transferable to a work setting.  Instead, plaintiff's treatment records reveal that plaintiff's mental

21 impairments:  prevented him from adequately feeding himself; caused him to suffer weekly panic

22 attacks, nightmares, and periods of sleeplessness lasting 24-48 hours; confined him to bed for

23 multiple days at a time; induced suicidal ideation and planning; interfered with his personal

24 grooming; and caused him to avoid interacting with people.

25

26 Further, although plaintiff eventually started doing some yard work, became friendly with

27 a neighbor, and went on a fishing trip, these activities are not inconsistent with plaintiff's

28 allegation that his mental impairments would preclude him from performing a full-time job in a

workplace setting.  First, there is no indication that these activities either comprised a "substantial" portion of plaintiff's day or were "transferrable" to a work environment.  *See id.*; *see also* <u>Smolen</u>, 80 F.3d at 1284 n. 7 (recognizing that "many home activities may not be easily transferrable to a work environment").   Second, these signs of improvement must be "interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace." *See* <u>Garrison</u>, 759 F.3d at 1017.  Accordingly, plaintiff's daily activities did not provide a clear and convincing reason supported by substantial evidence for discounting plaintiff's testimony about the severity and limiting effects of his mental impairments.

## VI.    The ALJ Did Not Err In Considering Dr. Sophon's Opinion.

Plaintiff's final contention is that the ALJ "should have explicitly excluded [Dr. Sophon's] opinion from her analysis," because Dr. Sophon surrendered his license to practice medicine in West Virginia in 2001, and never had it reinstated.  (Joint Stip. at 32.)  The relevant regulations provide that the Commissioner shall not use:

> any individual or entity, except to provide existing medical evidence, who is currently excluded, suspended, or otherwise barred from participation in the Medicare or Medicaid programs, or any other Federal or Federally-assisted program; whose license to provide health care services is currently revoked or suspended by any State licensing authority pursuant to adequate due process procedures for reasons bearing on professional competence, professional conduct, or financial integrity; or who, until a final determination is made, has surrendered such a license while formal disciplinary proceedings involving professional conduct are pending.

20 C.F.R. §§ 404.1503a, 416.903a.

1         Although Dr. Sophon "surrendered" his medical license in the State of West Virginia,[9] there

2   is no indication in the Joint Stipulation or elsewhere that Dr. Sophon surrendered his license

3   following the initiation of formal disciplinary proceedings.   Because Dr. Sophon is a licensed

4   physician in the State of California, and plaintiff presents no evidence that casts doubt on his

5   qualifications to examine plaintiff and present his findings to the Commissioner for consideration,

6   the ALJ did not err by taking Dr. Sophon's opinion regarding plaintiff's back pain into account.

7   Accordingly, remand is not warranted on this ground.

8

9                            **CONCLUSION**

10

11         For the reasons stated above, the Court finds that the Commissioner's decision regarding

12   plaintiff's mental impairments is not supported by substantial evidence and free from material

13   legal error.   Accordingly, IT IS ORDERED that the decision of the Commissioner is REVERSED, and

14   this case is REMANDED for further proceedings consistent with this Memorandum Opinion and

15   Order.

16

17         IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this

18   Memorandum Opinion and Order and the Judgment on counsel for plaintiff and for defendant.

19

20         **LET JUDGMENT BE ENTERED ACCORDINGLY**.

21

22   DATED: May 18, 2015

23                          _____

24                          MARGARET A. NAGLE

25                          UNITED STATES MAGISTRATE JUDGE

26

27

28

---

[9] *See* https://wvbom.wv.gov/public/search/details.asp?t=1347518.